# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

|  |  |
|---|---|
| ADRIAN TRUCKING, INC.,<br><br>       Plaintiff,<br><br>vs.<br><br>NAVISTAR, INC. and CENTRE STATE INTERNATIONAL TRUCKS, INC.,<br><br>       Defendants. | No. C20-99-LTS<br><br><br>**MEMORANDUM OPINION AND ORDER ON PENDING MOTIONS FOR SUMMARY JUDGMENT** |

## I.    INTRODUCTION

This case is before me on motions for summary judgment (Docs. 69, 70)[1] filed by defendants Navistar, Inc. (Navistar), and Centre State International Trucks, Inc. (Centre).  Plaintiff Adrian Trucking, Inc. (Adrian), has filed resistances (Docs. 83, 85) and Navistar and Centre have filed replies (Docs. 88, 89).  I find that oral argument is not necessary.  *See* Local Rule 7(c).

## II.    PROCEDURAL HISTORY

Adrian commenced this action by filing a petition at law and jury demand in the Iowa District Court for Linn County in December 2015.  Doc. 4.  At the time, the lawsuit named several other parties as plaintiffs and defendants.  *Id.*  Navistar and Centre filed answers and the parties engaged in discovery.  Doc. 2-4.  In November 2016, the state court severed (Doc. 2-2) the case into four separate cases.   Navistar and Centre then removed (Doc. 2) this case to this court based on diversity of citizenship jurisdiction.

---

[1] Because the motions, resistances, and responses are largely duplicative, I will cite to the filings between Adrian and Navistar except as to claims alleged solely against Centre.

In February 2017, the case was transferred to the United States District Court for the Northern District of Illinois to be included in a multidistrict litigation (MDL) pending in that court. Doc. 10. In September 2020, the MDL court returned the case to this court. Doc. 22. On October 9, 2020, Navistar and Centre filed a motion to dismiss for failure to state a claim (Doc. 28), which I denied as moot (Doc. 53) after allowing Adrian to file an amended complaint (Doc. 48).

As amended, Adrian's complaint asserts various contract and tort law claims. Counts I, II and VI assert that Navistar breached an express warranty, that Navistar breached a contract and that Navistar limited or disclaimed warranties in an unconscionable manner. *Id.* at 7, 10, 26. Count III alleges that Centre breached an implied warranty. *Id.* at 12. Count IV alleges fraud against both defendants and Count V alleges fraudulent concealment[2] against both defendants. *Id.* at 14, 21. Trial is scheduled to begin February 6, 2023. Doc. 93.

## III.    SUMMARY JUDGMENT STANDARDS

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id.* Facts that are "critical"

---

[2] Under Iowa law, the tort of fraudulent concealment is called fraudulent nondisclosure. *Wright v. Brooke Group Ltd.*, 114 F. Supp. 2d 797, 820 n.10 (N.D. Iowa 2000). I will refer to Count V accordingly.

2

under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.*

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249–50, does not make an issue of material fact genuine. "Mere allegations not supported with specific facts are insufficient to establish a material issue of fact and will not withstand a summary judgment motion." *Henthorn v. Capitol Communications, Inc.*, 359 F.3d 1021, 1026 (8th Cir. 2004).

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248–49. The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

3

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587–88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376–77 (8th Cir. 1996).

## IV. RELEVANT FACTS

Except as otherwise noted, the following facts are undisputed for purposes of the pending motions for summary judgment:

Adrian owns and operates a commercial trucking fleet that hauls general freight across the United States. Doc. 70-2 at 1, ¶ 1. Howard Adrian has been the sole owner of Adrian since 1994. *Id.* at 2, ¶ 4. Centre is a vehicle dealership that has a dealership agreement with Navistar. *Id.* at 10, ¶ 77. The dealership agreement states that Centre "is not Navistar's agent in any respect and is not authorized to incur any obligations or make any promises or representations in its behalf." *Id.*; Doc. 71 at 4.

At some point in late 2012, two Centre representatives made a sales visit to Adrian and spoke with Howard Adrian. Doc. 83-1 at 2, ¶¶ 5-7. The two Centre representatives were Rex Ott, Centre's General Manager, and Raymond (Ray) Ott, Rex's son and a Centre sales representative. *Id.* at 2, ¶¶ 6-7. Howard Adrian "understood that Navistar was a separate legal entity from Centre." Doc. 70-2 at 10, ¶ 74. However, Adrian alleges that "the dealer[ship] agreement has numerous provisions imposed by Navistar that give rise to an appearance of apparent authority." Doc. 83-1 at 15, ¶ 77.

Rex Ott and Ray Ott were the only individuals Howard Adrian spoke with before deciding to purchase six Navistar-manufactured trucks with Navistar MaxxForce engines.

4

*Id.* at 3, ¶¶ 9, 12-13, 15-16. He talked to them for about 90 minutes before agreeing to buy the trucks at a price of $76,500 each.[3] *Id.* at 3, ¶ 9. A day or two after this visit, Howard Adrian called Centre to request to purchase the five additional trucks. *Id.* at 3, ¶ 10. Adrian purchased six of the trucks in December 2012, four of the trucks in January 2013 and the last truck in April 2013. *Id.* at 2, ¶ 3.

Each of the eleven trucks had previously been used and "operated between 185,902 miles to 232,797 miles, with an average of approximately 206,035 miles." *Id.* at 4, ¶ 26. They all came with three custom service contracts that were transferred to Adrian, along with each truck's standard limited warranty. *Id.* at 6-7, ¶ 42. Howard Adrian stated that the warranties were "very good" and the three custom service contracts "basically covered everything on the truck for me." *Id.* at 10, ¶¶ 71-72.

The warranty limited Adrian's remedies to "repair or replace any part of this vehicle which proves defective in material and/or workmanship in normal use and service." Doc. 70-3 at 13. The warranty specifically does not cover "[l]oss of time or use of the vehicle, loss of profits, inconvenience, or other consequential or incidental damages or expenses." Doc. 70-3 at 14. The warranyt also states:

> no warranties are given beyond those described herein. This warranty is in lieu of all other warranties, express or implied. [Navistar] specifically disclaims warranties of merchantability and fitness for a particular purpose, all other representations to the user/purchaser, and all other obligations or liabilities. [Navistar] further excludes liability for incidental and consequential damages on the part of [Navistar] or seller.

*Id.* at 13.

The three custom service contracts extended the length of the original warranty coverage and specifically covered the MaxxForce engines, parts related to the fan, electrical, air conditioning and heating. *Id.* at 16-17, 19, 21. Each stated that Navistar

---

[3] The substance of this conversation will be discussed further in the sections regarding Adrian's claims of fraud and fraudulent concealment.

"will repair or replace any part of this vehicle covered component(s) which proves defective in material and/or workmanship in normal use, with new or ReNEWed parts." *Id.* at 16-17, 19 (emphasis in original). Each disclaimed coverage of:

> [i]ncidental or consequential costs or expenses which the owner may incur as a result of a malfunction or failure covered by this warranty, such as vehicle damage, communication expenses, meals, lodging, overtime, loss of use of engine or vehicle ("downtime"), loss of time, inconvenience, cargo loss or damage, and other similar costs and expenses.

*Id.* at 16, 18, 20.

The crux of Adrian's complaint is that the Navistar MaxxForce engine technology caused the trucks to break down. Doc. 48 at 5-6. Adrian states that, to meet 2010 Environmental Protection Agency (EPA) standards, "Navistar used an exhaust gas recirculation ("EGR") system that recirculates the exhaust gas produced by the engine back into the engine to be re-combusted." *Id.* at 5. Adrian's statement of additional material facts focuses on the relationship between Navistar and its dealerships and Navistar's knowledge of contested issues with the MaxxForce EGR engines in general.[4] Doc. 83-2. None of the additional facts describe Navistar's and Centre's business relationship or specific issues with the trucks Adrian purchased. *Id.* Thus, I must rely on Navistar's and Centre's undisputed account of the repairs done to Adrian's trucks.

Navistar and Centre explain that "Adrian operated each of the [t]rucks an average of approximately 40.7 days and 10,686 miles after their dates of purchase before they needed any repair, and longer before they needed any engine or emissions system-related repair." Doc. 70-2 at 4, ¶ 21. Further, Adrian purchased the last truck 77 days after it bought the last of the ten other trucks and after eight of those trucks had their first repair under Adrian's ownership. *Id.* at 4, ¶ 22.

---

[4] Navistar and Centre deny and/or object to all these additional facts. Docs. 88-1, 89-1. However, neither party complied with Local Rule 56(d), which requires denials of factual allegations to cite evidentiary support for the denials. *Id.*

As for each truck's specific repairs following Adrian's purchase, Adrian's expert Anthony Greszler provides information as to nine of the eleven. *Id.* at 10, ¶ 78. Greszler states that the nine trucks "experienced 131 engine related repairs during their first two years/200,000 miles." Doc. 83-5 at 194. However, Adrian bought the trucks used a little over one year after they were first purchased.[5] Doc. 70-3 at 21-31. The odometer readings for the eleven trucks when Adrian purchased them are as follows: (1) 197,510; (2) 213,986; (3) 185,902; (4) 232,797; (5) 208,505; (6) 194,057; (7) 198,278; (8) 208,525; (9) 205,006; (10) 215,382; (11) 206,432. *Id.* Greszler has provided an opinion regarding the number of repairs or replacements needed for a component called the "Hot EGR Cooler." Doc. 70-2 at 10-11, ¶ 79. He concludes that "nine trucks experienced at least one [Hot EGR Cooler] leaking failure. Eight experienced a second failure and one experienced a third and fourth failure while operated by Adrian." Doc. 83-5 at 194-95. Greszler states that the nine trucks "experienced a failure prior to 200,000 miles and one truck had two failures prior to 200,00 miles for a total of 10 failures." *Id.* at 195. Adrian does not provide any supporting documentation or details regarding the dates these failures and subsequent repairs allegedly occurred.

Navistar's and Centre's expert, Timothy Tindall, claims that Greszler's report "ignores whether the 'Hot EGR Cooler leaks or replacement' events occurred before or after Adrian purchased the trucks." Doc. 70-2 at 11, ¶ 80. Thus, after taking into account the mileage of the trucks when Adrian bought them, Tindall suggests Greszler's report shows "only one [t]ruck experienced two 'Hot EGR Cooler leak or Replacement' events, seven [t]rucks experienced one such event, and one [t]ruck experienced no such event" while Adrian owned them. *Id.* at 11, ¶ 81. Adrian disagrees with Tindall's characterizations and states that Greszler's report speaks for itself. Doc. 83-1 at 16, ¶¶

---

[5] One of the trucks has an original sale date of April 25, 2013, which is also the date listed for Adrian's purchase. Doc. 70-3 at 26. Since the parties agree all of the trucks were bought used and the odometer reading for this truck is listed as 194,057, I will assume this was a clerical mistake.

80-81.  However, no party has provided Greszler's full report,[6] including the apparent Exhibits A, B and C Tindall reviewed.  Doc. 70-3 at 6, ¶ 9 (Tindall's report).  Further, Adrian did not provide any evidence showing what repairs were performed on which trucks, and when.  Doc. 83-2.

Regardless of what repairs did or did not occur, Adrian never had to pay out of pocket for any parts or repairs covered by the warranties.  Doc. 70-2 at 11, ¶ 82.  Nor does Howard Adrian recall any instance in which his company took a truck in for repairs and it was not repaired.  *Id.* at 11, ¶ 83.  According to Navistar's records, only two repair claims had been denied.  *Id.* at 11, ¶ 86.  One denial was labeled as such because there were no parts, labor or associated costs for the claim and the second was denied because the warranty term for the part had ended.  *Id.* at 11-12, ¶¶ 87-88.

On July 27, 2015, seven months after the service contracts expired, Adrian sold nine of the eleven trucks.  *Id.* at 12, ¶ 94.  Adrian generally alleges that trucks with MaxxForce engines sell for less than comparable used trucks[7] but provides no evidence as to the amount Adrian received for the trucks.  Doc. 83-2 at 14, ¶ 70.

## V.    DISCUSSION

### A.    Adrian's Contract Claims

Counts I, II and VI assert that Navistar breached an express warranty, breached a contract and unconscionably limited or disclaimed warranties and remedies.  Doc. 48 at 7, 10, 26.  Count III alleges that Centre breached an implied warranty.  *Id.* at 12.

---

[6] Out of the hundreds of pages of all the parties' appendixes, the only relevant material allegedly attributable to Greszler is a chart provided by Navistar and Centre (Doc. 70-3 at 2, 44 (a chart described in Navistar and Centre's table of contents as "Anthony Greszler Report 'C' Excerpt")) and an unsworn report summary, a different chart and an engine replacement invoice for one truck provided by Adrian (Doc. 83-5 at 194-98).  Local Rule 56(e) requires that "[a] document included in an appendix must be authenticated properly, by affidavit or in some other lawful manner, or it may not be considered by the court in ruling on a motion for summary judgment."

[7] Navistar and Centre object to this allegation without any supporting documentation.

### 1. Adrian's Contract Claims Against Navistar (Counts I, II and VI)

Navistar argues that Adrian's claims of breach of express warranty, breach of contract and unconscionable warranty limitations and disclaimers fail for several reasons. Doc. 70-1 at 18. First, the custom service contracts were intended to repair or replace enumerated parts that were "defective in material and/or workmanship in normal use, with new or ReNEWed parts." Doc. 70-3 at 16-17, 19. Navistar argues that it never denied repair or replacement for any covered parts. Doc. 70-1 at 18. It also maintains that the contracts did not guarantee a certain time period between each repair or replacement and Adrian cannot prove the frequency of repairs or replacements was unreasonable. *Id.* Navistar also asserts that Adrian cannot prove any parts were defective as to material and/or workmanship. *Id.* Finally, Navistar argues it is entitled to summary judgment due to the nature of the damages Adrian seeks and the contracts' damages limitations clauses. *Id.* at 23. Because the damages limitations clauses, if enforceable, may foreclose further analysis of Adrian's breach of express warranty and breach of contract claims, I will address that issue first.

### a. Did the Limited Remedy Fail as to its Essential Purpose?

Both the express warranties and the custom service contracts include language limiting damages to repair and/or replacement, excluding incidental and consequential damages. Doc. 70-3 at 13-14, 16, 18, 20. The custom service contracts also limited remedies to repair and/or replacement. *Id.* at 16-17, 19. Adrian admittedly seeks damages only for lost profits due to "downtime" and diminished resale value (Doc. 83-1 at 18), which are excluded by the contract language. However, Adrian claims:

> Navistar's acts have rendered all exclusive or limited express warranties or limited remedies inapplicable because they have failed their essential purpose in that no amount of repair has been able to effectively remedy the defects in materials and/or workmanship in the 11 [t]rucks [Adrian] purchased . . ., as even if Navistar exercised good faith, Navistar did not (and could not) fulfill within a reasonable time its obligation to replace or completely repair the equipment.

9

Doc. 48 at 26-27, ¶ 103. Adrian also claims that "Navistar and Centre acted with deception both substantively and procedurally and as such the attempted limitation of damages and remedies by Navistar is outrageous." *Id.* at 27, ¶ 105.

Navistar responds that the contractual remedy and damages limitations are supported by Iowa law.[8] Doc. 70-1 at 23-24. Because "[t]he issue of whether a limited remedy fails of its essential purpose is separate and distinct from whether a limited remedy is unconscionable," *Brown v. Louisiana-Pacific Corp.*, 820 F.3d 339, 350 (8th Cir. 2016) (cleaned up), I will address each in turn.

Iowa's Uniform Commercial Code (UCC) allows sellers to limit the remedies for breach of warranty to the repair or replacement of goods. *R.J. Meyers Co. v. Reinke Mfg. Co., Inc.*, 885 N.W.2d 429, 437 (Iowa Ct. App. 2016); *see* Iowa Code § 554.2719(1)(a). However, buyers may seek other remedies described in the UCC, including damages, if a contractual limited remedy fails of its essential purpose. *R.J. Meyers Co.*, 885 N.W.2d at 437-38. "A remedy's essential purpose is to give a buyer what the seller promised the buyer." *J&R Transport, Inc. v. Navistar, Inc.*, No. 18-0774, 2020 WL 821947, at *3 (Iowa Ct. App. Feb. 19, 2020) (unpublished) (cleaned up).

A repair or replace limited remedy may fail when "the seller is given a reasonable chance to correct defects and the equipment still fails to function properly." *Id.* (cleaned up). However, when "repair or replacement can give the buyer what is bargained for, a limitation of remedies does not fail of its essential purpose." *Id.* at 437 (cleaned up). Specifically, the "analysis is not whether the remedy compensates for all damage that occurred, but that the buyer is provided with the product as seller promised." *Midwest Hatchery & Poultry Farms, Inc. v. Doorenbos Poultry, Inc.*, 783 N.W.2d 56, 62-63 (Iowa Ct. App. 2010) (cleaned up). Thus, Adrian must show that Navistar's repairs and

---

[8] Neither party contends that the law of any state other than Iowa applies in this diversity action.

part replacements were insufficient to meet the parties' bargained-for expectations and therefore failed as to its essential purpose.

The unpublished decision by the Iowa Court of Appeals in *J&R Transport* analyzed this issue under facts analogous to those here. In that case, the plaintiff purchased used Navistar trucks equipped with MaxxForce engines. 2020 WL 821947, at *1. J&R Transport received the same Navistar limited warranty and purchased the same service contracts to extend the length of the warranties. *Id.* As in this case, the plaintiff based its claims largely on Navistar's MaxxForce engine technology and repairs to those engines. *Id.* J&R Transport also argued that "the trucks' warranties failed of their essential purpose because the trucks required a large number of repairs, including some repeated repairs of the EGR [engine] system." *Id.* at *3. Specifically, J&R Transport's trucks all had at least one EGR cooler failure, twelve trucks experienced a second failure, and one experienced three total failures. *Id.*

The Iowa Court of Appeals rejected the plaintiff's argument that the multiple repairs gave rise to a fact issue sufficient to survive summary judgment. *Id.* The court explained that "Navistar did not warrant a defect-free truck, or a repair-free truck, or even a truck-with-few repairs." *Id.* (footnote omitted). The court noted that J&R Transport's trucks averaged between 100,00 and 120,000 miles per year, and the Navistar MaxxForce engine trucks averaged 106,000 miles per year when J&R Transport operated them. *Id.* at *4. Thus, even though the Navistar trucks experienced repairs and subsequent downtime, they still fell within J&R Transport's average truck mileage. *Id.* Further, J&R Transport failed to show why each particular warranty for each specific truck failed as to its essential purpose, as J&R Transport failed to provide additional details, "such as the dates on which these problem[s] occurred or the miles travelled between the occurrences." *Id.* The court noted that, at most, one truck experienced three significant repairs at some undetermined time, which was "not enough to show repair could not give the buyer what was bargained for, a truck of reasonable usefulness."

11

*Id.* (cleaned up). Thus, the court affirmed the grant of summary judgment on the issue of whether Navistar's limited warranties failed of their essential purpose.

Here, the parties agree that "Adrian operated each of the [t]rucks an average of approximately 40.7 days and 10,686 miles after their dates of purchase before they needed any repair, and longer before they needed any engine or emissions system-related repair." Doc. 70-2 at 4, ¶ 21. Adrian's expert, Greszler, listed some repairs for nine out of the eleven total trucks. *Id.* at 10, ¶ 78. He concluded that during the time Adrian operated the nine trucks he evaluated, one truck experienced one hot EGR cooler failure, seven experienced two failures and one experienced four failures. Doc. 83-5 at 194-95. Navistar's and Centre's expert, Tindall, notes that the failure numbers are different after taking into account the mileage of the trucks when Adrian bought them. Doc. 70-2 at 11, ¶ 81. Tindall claims instead that one truck did not have a hot EGR cooler failure, seven trucks experienced one failure and only one truck experienced two failures. *Id.*

Neither expert's conclusions reach the level of repair necessary to establish a failure of essential purpose under Iowa law. *See J&R Transport*, 2020 WL 821947, at *4 (explaining that "a situation in which a vehicle could be so lacking in function—no matter what repairs are attempted—that a promise to repair is worthless. In those cases, a promise to repair may well fail of its essential purpose."). Construing the facts most favorably to Adrian, Greszler's conclusion that one truck experienced one hot EGR cooler failure, seven experienced two failures and one experienced four failures still directly tracks the failures listed by *J&R Transport* (all had one failure, twelve had two and one had three). Further, like J&R Transport, Adrian did not provide details regarding each truck as to when specific failures occurred, thus failing to show how each particular warranty for each specific truck failed as to its essential purpose. Similar to J&R Transport's one truck that experienced three failures, the fact that Adrian had one truck that may have experienced four failures is "not enough to show repair could not give the buyer what was bargained for, a truck of reasonable usefulness." *J&R Transport, Inc.*, 2020 WL 821947, at *4 (cleaned up). As a matter of law, Adrian has

12

failed to show that circumstances caused Navistar's limited remedies to fail of their essential purpose.

### b. Was the Limited Remedy Unconscionable?

Adrian alternatively alleged in its amended complaint that the limited remedy was unconscionable from the start. Doc. 48 at 27, ¶ 105. Navistar seeks summary judgment as to this theory, arguing that the contractual limited remedies are not unconscionable, either procedurally or substantively. Doc. 70-1 at 24. Navistar states Howard Adrian "was a sophisticated purchaser of heavy-duty trucks with 18 years' experience" owning Adrian, and therefore he is akin to the "intelligent business entity" the Iowa Supreme Court described in rejecting an unconscionability argument in *C&J Vantage Leasing Co. v. Wolfe*, 795 N.W.2d 65, 81 (Iowa 2011). *Id.*

In its resistance, Adrian simply states, "[w]hile Navistar attempts to focus on unconscionability with respect to its disclaimer language, that is not the issue." Doc. 83 at 24. Adrian instead focuses solely on whether the limited remedies failed of their essential purpose. *Id.* This constitutes a waiver by Adrian of its unconscionability argument. *See, e.g., Satcher v. Univ. of Arkansas at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 735 (8th Cir. 2009). Navistar is entitled to summary judgment on this issue.

### c. Effect of Remedies Limitation

Because the contractually-agreed remedies limitation was not unconscionable, and did not fail of its essential purpose, it is enforceable against Adrian. As such, the only remedies available to Adrian are repair and replacement, not the consequential and incidental damages it seeks against Navistar. Adrian's contract-based claims against Navistar (Counts I, II and VI) fail as a matter of law.

13

## 2.    Adrian's Breach of Implied Warranty Claim against Centre (Count III)

Adrian generally alleges that "Centre impliedly assured [Adrian] that the [t]rucks were free from defects and were suitable to perform the duties for which they were manufactured and sold.  Further, Centre impliedly assured [Adrian] that the [t]rucks were merchantable."  Doc. 48 at 12-13, ¶¶ 53-54.  Centre argues that pursuant to Iowa Code § 554.2314, the trucks were merchantable at the time Adrian purchased them.  Doc. 69-1 at 17-18.  Centre relies on the undisputed fact that Adrian operated the trucks an average of 105,699 miles per year (surpassing Howard Adrian's goal of running them 100,000 miles per year) as evidence that the trucks fulfilled their ordinary purpose.  *Id.* at 18-19.

"The warranty of merchantability is based on a purchaser's reasonable expectation that goods purchased from a merchant with respect to goods of that kind will be free of significant defects and will perform in the way goods of that kind should perform."  *Des Moines Flying Service, Inc. v. Aerial Services Inc.*, 880 N.W.2d 212, 217 (Iowa 2016).  To be merchantable, goods must:

  a. pass without objection in the trade under the contract description; and

  b. in the case of fungible goods, are of fair average quality within the description; and

  c. are fit for the ordinary purposes for which such goods are used; and

  d. run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

  e. are adequately contained, packaged, and labeled as the agreement may require; and

  f. conform to the promises or affirmations of fact made on the container or label if any.

Iowa Code § 554.2314(2).  Adrian has not specified which prong of the statute it relies on, but Adrian's general assertion that Centre impliedly assured "the trucks were free from defects and were suitable to perform the duties for which they were manufactured and sold" (Doc. 48 at 12, ¶ 53), appears to be a claim under prong (c).  Centre interpreted

Adrian's claim in this manner in its motion for summary judgment (Doc. 69-1 at 16) and Adrian did not argue otherwise in its resistance (Doc. 85 at 13-14). As such, I will treat Adrian's implied warranty claim against Centre as a claim under Iowa Code § 554.2314(2)(c).

The Iowa Supreme Court has held that such a claim "requires proof of a product defect as defined in Products Restatement section 2." *Wright v. Brooke Group Ltd.*, 652 N.W.2d 159, 181-82 (Iowa 2002); *see also Liguria Foods, Inc. v. Griffith Laboratories, Inc.*, No. C14-3041-MWB, 2017 WL 326308, at *4 (N.D. Iowa Jan. 23, 2017) (summarizing Iowa's implied warranty of merchantability caselaw following *Wright*). Thus, a breach of the implied warranty of merchantability claim under prong (c) requires "proof of the standard for either a manufacturing defect, a design defect, or a failure to warn." *Scott v. Dutton-Lainson Co.*, 774 N.W.2d 501, 505 n.2 (Iowa 2009).

Neither Centre nor Adrian directly addressed *Wright*'s mandate to provide proof of a product defect. Doc. 69-1 at 16-19; Doc. 85 at 13-14; Doc. 89 at 4-5. Adrian generally argues that "the MaxxForce engine was plagued with repeated breakdowns that could not be effectively repaired, leading to more of the same breakdowns." Doc. 85 at 13. The Eighth Circuit has upheld the entry of summary judgment on a merchantability claim "[b]ecause the plaintiffs failed to make a showing sufficient to establish a [duplicative product liability] manufacturing defect [claim] in either the extension or lamp cords." *Depositors Ins. Co. v. Wal-Mart Stores, Inc.*, 506 F.3d 1092, 1095-96 (8th Cir. 2007) (applying Iowa law). In that case, the plaintiffs based their merchantability claim on an argument that "the extension and lamp cords were not fit for the ordinary purpose for which cords are used." *Id.* at 1095. They also argued generally that the product "failed to conform to the defendants' promises, however, the plaintiffs never identified any promises made by the defendants." *Id.* at 1095 n.3 (citing Iowa Code § 554.2314(2)(f), requiring products to "conform to the promises or affirmations of fact made on the container or label"). However, because the plaintiffs failed to prove a product defect, the Eighth Circuit relied on *Wright* to affirm the grant of summary

15

judgment on their implied warranty of merchantability claim. *Id.* at 1095-96; *see also Boddicker v. American Honda Motor Co., Inc.*, No. C10–1018, 2011 WL 5101912, at *13 (N.D. Iowa Oct. 25, 2011) (explaining that the "failure to prove a product defect will defeat both a products liability claim and a claim for breach of an implied warranty of merchantability").

As in *Depositors*, summary judgment is appropriate here because Adrian has failed to provide evidence of a product defect. Adrian's general allegation that all MaxxForce engines were "plagued with repeated breakdowns that could not be effectively repaired, leading to more of the same breakdowns" (Doc. 85 at 13) is not sufficient to create an issue of genuine material fact regarding the existence of a manufacturing defect, design defect or failure-to-warn defect. Because Adrian has failed to produce evidence of a product defect, as required by *Wright*, its breach of the implied warranty of merchantability claim against Centre fails as a matter of law.

**B.      Adrian's Fraud-Based Claims**

Adrian asserts claims of fraud (Count IV) and fraudulent nondisclosure (Count V) against both defendants. Doc. 48 at 14, 21. Before I address the merits of these fraud-based claims, I will consider Navistar's and Centre's argument that they are barred in this case by Iowa's economic loss rule. Generally, under Iowa law, "the economic loss rule bars recovery in negligence when the plaintiff has suffered only economic loss." *Annett Holdings, Inc. v. Kum & Go, L.C.*, 801 N.W.2d 499, 502 (Iowa 2011). The rule arises from the concept that "[w]hen two parties have a contractual relationship, the economic loss rule prevents one party from bringing a negligence action against the other over the first party's defeated expectations—a subject matter the parties can be presumed to have allocated between themselves in their contract." *Id.* at 503.

Navistar and Centre argue that I should extend the economic loss rule to bar "breach of contract claims recast as fraud." Doc. 69-1 at 15; Doc. 70-1 at 16. The parties agree that no Iowa appellate court has extended this negligence-based rule to the

16

intentional tort of fraud. Doc. 69-1 at 15; Doc. 70-1 at 16; Doc. 85 at 10. In two prior cases, this court has declined to extend the economic loss doctrine in the absence of definitive authority from Iowa's state courts. *Cunningham v. PFL Life Ins. Co.*, 42 F. Supp. 2d 872, 886-87 (N.D. Iowa 1999) ("Although Iowa courts have not plainly stated that fraud claims are an exception to the economic loss doctrine, the case law does suggest that if confronted with the question directly, Iowa would articulate that position"); *Johnson v. Land O'Lakes, Inc.*, 18 F. Supp. 2d 985, 1001 (N.D. Iowa 1998).[9] I agree, and similarly decline to extend the economic loss rule to preclude Adrian's fraud claim and fraudulent nondisclosure claims absent express direction from Iowa's state courts. As such, I will address the merits of those claims.

> Under Iowa law:
>
> To establish a claim for fraudulent misrepresentation, [a plaintiff] has the burden of proving each of the following elements: "(1) representation, (2) falsity, (3) materiality, (4) scienter, (5) intent to deceive, (6) reliance, and (7) resulting injury and damage." These elements must be established by "a preponderance of clear, satisfactory, and convincing proof."

*Van Sickle Constr. Co. v. Wachovia Commercial Mortg., Inc.*, 783 N.W.2d. 684, 687 (Iowa 2010) (quoting *Lloyd v. Drake Univ.*, 686 N.W.2d 225, 233 (Iowa 2004)). A claim of fraudulent nondisclosure is analyzed under a similar framework, with the nondisclosure of a material fact serving as the "representation" element. *See Anderson v. Boeke*, 491 N.W.2d 182, 188 (Iowa 1992) (a representation "need not be an affirmative misstatement," as fraud "can also arise from the failure to disclose material facts"); *Schaller Telephone Co. v. Golden Sky Systems, Inc.*, 298 F.3d 736, 740 (8th Cir. 2002) (noting that "Iowa law recognizes a cause of action for fraudulent misrepresentation based on nondisclosure of material facts").

---

[9] The Southern District of Iowa has reached the same conclusion in at least one case. *Union County, IA v. Piper Jaffray & Co., Inc.*, 741 F. Supp. 2d 1064, 1113-14 (S.D. Iowa 2010) ("the Court can find no Iowa case applying the doctrine to an intentional tort").

Adrian's fraud-based claims fall into three general categories. First, it alleges that Centre employees Rex Ott and Ray Ott knowingly made false representations of material fact to Howard Adrian to induce Adrian to purchase the trucks at issue. Doc. 48 at 14, ¶ 58. Adrian seeks to hold Navistar (in addition to Centre) liable for these alleged misrepresentations on a theory that Centre was acting as Navistar's agent when they were made. *Id.* at 15-19, 23-24, ¶¶ 65-74, 89-91.

Second, Adrian alleges that Navistar manufactured and distributed trucks with MaxxForce engines "while continuing to make false representations to the public and [Adrian] regarding the performance capabilities and reliability [of] the engines that Navistar knew to be false." *Id.* at 15, ¶ 65. Third, Adrian contends that Navistar and Centre concealed "material facts when [Navistar and Centre] each were under a duty to disclose those facts to Plaintiff." *Id.* at 21, ¶ 84. I will start by addressing Adrian's fraud theories against Navistar.

### 1. *Fraud-Based Claims Against Navistar*
#### a. *Agency*

Adrian's agency theory is based on its argument that Navistar conveyed apparent authority to Centre to act as Navistar's agent. Doc. 83 at 7. Navistar argues it is entitled to summary judgment on this count because Rex Ott and Ray Ott, as Centre employees, were not Navistar agents under Iowa agency law. Doc. 70-1 at 9. Navistar points out that, to consider a claim of apparent authority, "the court must focus on the principal's actions and communications to the third party." *Id.* at 11 (quoting *C&J Vantage Leasing Co. v. Wolfe*, 795 N.W.2d 65, 79 (Iowa 2011)). Because Howard Adrian had no direct communication with Navistar, admitted he knew Navistar and Centre were separate legal entities and testified that the Otts did not represent that they were selling the trucks on behalf of Navistar, Navistar argues that Adrian cannot prove Navistar had apparent authority over Centre employees. *Id.*

Adrian's answer to this argument is simply that "Navistar's Dealer Agreements are replete with indicia that Navistar intended for Centre State to hold itself out as an authorized dealer and servicer of Navistar products." Doc. 83 at 7. In particular, Adrian points to Navistar's direction over Navistar signage at the dealership, requirements that Centre employees go to Navistar meetings and use Navistar promotional and training materials, allowing Centre to brand itself as an authorized Navistar dealer and servicer and disallowing Centre to hold itself out so after the Dealer Agreement terminates. *Id.* at 8. In effect, Adrian seems to argue that a traditional, contractual relationship between a manufacturer and an authorized dealer of a product creates an agency relationship.

Navistar notes that it has never denied Centre was an authorized dealer and servicer but argues that such status is not sufficient to demonstrate apparent authority. Doc. 88 at 1. Navistar also points out that Howard Adrian did not testify that "he thought Centre was Navistar's agent, or even that he was aware of the Dealership Agreement terms or the alleged facts that Adrian relies on for agency." *Id.* Instead, Howard Adrian testified only to statements the Otts made during their meeting and noted that he knew Centre and Navistar were separate entities. *Id.* Finally, Navistar cites to the Iowa District Court's decision in *J&R Transport*, in which the court rejected the plaintiff's claim that Navistar's agreement with its dealer created an agency relationship. *J&R Transport, Inc. v. Navistar, Inc.*, No. LACV084412, 2018 WL 10788615, at *6 (Iowa Dist. Ct. Feb. 26, 2018) ("While Navistar and [dealer] clearly do have a business relationship, it fails to meet the definition of an agent-principal relationship under Iowa law.").

Under Iowa law, "[t]he party asserting an agency relationship must prove it exists by a preponderance of the evidence." *Frontier Leasing Corp. v. Links Engineering, LLC*, 781 N.W.2d 772, 776 (Iowa 2010). "Apparent authority is authority the principal has knowingly permitted or held the agent out as possessing." *Id.* Apparent authority is decided based on the principal's communications to the third party, meaning it "must be determined by what the principal does, rather than by any acts of the agent." *Id.* (cleaned

19

up). Here, the only possible indication of a relationship between Navistar and Centre of which Howard Adrian was aware is the fact that Centre was an authorized dealer and servicer of Navistar products that sold him used Navistar trucks with Navistar service contracts. There is no evidence of any communications of any kind by Navistar to Adrian prior to Adrian's purchase of eleven trucks. Nor is there evidence of any other actions by Navistar that could have conveyed to Adrian a suggestion that Centre was acting as Navistar's agent when it offered to sell, and ultimately did sell, trucks to Adrian. Thus, and as a matter of law, Navistar is not liable for any alleged misrepresentations made by Centre or Centre's employees.[10]

### b. *Fraudulent Misrepresentation and Nondisclosure*

Because Navistar is not legally responsible for any alleged misrepresentations made to Adrian by Centre, the question becomes whether Navistar may be liable based on its own alleged misrepresentations, or for failing to disclose material information to Adrian. Adrian's claim that Navistar made false representations fails as a matter of law because there is no evidence that Navistar made *any* representations to Adrian, let alone false representations. *See, e.g.,* Doc. 83-1 at 3, ¶¶ 12-14 (acknowledging that before deciding to purchase the trucks, Howard Adrian spoke to no one from Navistar and spoke

---

[10] I note that in *Todd Farm Corp. v. Navistar Int'l Corp.*, 835 F.2d 1253, 1256 (8th Cir. 1987), the Eighth Circuit applied Iowa law to determine that apparent authority did not exist under analogous circumstances. In that case, a buyer purchased farming equipment from a Navistar authorized dealer. *Id.* at 1254. The buyer argued that "statements contained in the owner's manual provided with the [equipment] encouraging buyers to contact their dealer in the event of adjustment problems" created a question for the jury. *Id.* at 1256. The court noted that there was no evidence the buyer "relied on or even was aware of the statements in the manual." *Id.* Further, the court found that the statements were "only an expression of brand loyalty by the manufacturer for its products" that encouraged "buyers of Navistar's products to consult a member of the Navistar-brand distribution network rather than a competitor." *Id.*

only with Centre employees Rex Ott and Ray Ott). Adrian admits that before purchasing the trucks, Howard Adrian "had never done any research, read any literature of any kind, seen any videos 'or anything' related to MaxxForce engine[s]" before purchasing the trucks at issue. *Id*. at 13, ¶ 64. Because there is no evidence that Navistar made any representations of any kind to Adrian, there is no basis for Adrian to assert a claim of fraudulent misrepresentation against Navistar.

Adrian's final fraud-based claim against Navistar is that Navistar committed fraud by failing to disclose material information about the EGR engines. Navistar argues that as a manufacturer, it had no duty under Iowa law to disclose material information to Adrian about the EGR engines. Doc. 70-1 at 14-15. Adrian argues generally that Navistar had superior knowledge such that it was required "to make a full and truthful disclosure of all material facts within that party's knowledge" to all consumers. Doc. 83 at 10-11 (quoting *Cornell v. Wunschel*, 408 N.W.2d 369, 375 (Iowa 1987)).

In *Wright*, the Iowa Supreme Court considered "whether a manufacturer has a duty to communicate 'material information' to the ultimate user of the manufacturer's product." *Wright v. Brooke Group Ltd.*, 652 N.W.2d 159, 174 (Iowa 2002). "Under Iowa law, the failure to disclose material information can constitute fraud *if* the concealment is made by a party under a duty to communicate the concealed fact." *Id.* (cleaned up) (emphasis in original). The Court held:

> a manufacturer's failure to warn or to disclose material information does not give rise to a fraud claim when the relationship between a plaintiff and a defendant is solely that of a customer/buyer and manufacturer with two exceptions. Those exceptions are limited to instances where the manufacturer (1) has made misleading statements of fact intended to influence consumers, or (2) has made true statements of fact designed to influence consumers and subsequently acquires information rendering the prior statements untrue or misleading.

*Id.* at 177.

Neither exception recognized in *Wright* could possibly apply here because, as noted above, Adrian was not aware of any statements of fact made by Navistar (whether

true or misleading) before deciding to purchase the trucks at issue. Moreover, even if a duty to disclose might otherwise arise under *Wright*, Adrian has failed to establish other elements of a fraudulent nondisclosure claim, such as justifiable reliance and resulting harm. *See, e.g., Vos v. Farm Bureau Life Ins. Co.*, 667 N.W.2d 36, 52-53 (Iowa 2003) (noting that justifiable reliance is an essential element of all fraud-related claims, including claims of material omissions); *Johnson v. Harley Davison Motor Co. Group, Inc.*, No. 03–0444, 2004 WL 370251, at *10 (Iowa Ct. App. Feb. 27, 2004) (holding that regardless of *Wright*, plaintiffs could not show detrimental reliance "because (1) there is no evidence they saw the advertisements before purchasing the trailer, and (2) the [trailer] hitch was already installed on the motorcycle when they bought the motorcycle, so no advertisements could have influenced their decision").

As against Navistar, Adrian's fraud-based claims (Count IV and V) fail as a matter of law.

### 2. Fraud-Based Claims Against Centre

Adrian contends that Rex Ott and Ray Ott, in their capacities as Centre employees, made material false representations to Howard Adrian and, in addition, failed to disclose material facts regarding the EGR technology. Centre argues that Adrian has failed to produce evidence giving rise to any genuine issues of material fact for trial as to either of these claims.

#### a. Fraudulent Misrepresentation

Centre asserts (1) that Howard Adrian "did not rely on the documents the Otts showed him or on the Otts' purported statements;" and (2) "the documents and statements were true or nonactionable opinions or puffery." Doc. 69-1 at 8. With regard to reliance, Iowa law requires that the plaintiff "not only act in reliance on the misrepresentation, but the reliance must be justified." *Spreitzer v. Hawkeye State Bank*, 779 N.W.2d 726, 736 (Iowa 2009). "[T]he justified standard followed in Iowa means the reliance does not

22

necessarily need to conform to the standard of a reasonably prudent person, but depends on the qualities and characteristics of the particular plaintiff and the specific surrounding circumstances." *Id.* at 737. This standard essentially means "that the justifiable reliance element is viewed in light of plaintiff's own information and intelligence." *Dier*, 815 N.W.2d at *9 (citing *Lockard v. Carson*, 287 N.W.2d 871, 878 (Iowa 1980)). However, "the individual to whom the fraudulent misrepresentation is made is required to use his senses, and cannot recover if he blindly relies on a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Id.* (cleaned up).

In its resistance to Centre's motion, Adrian strangely ignored the reliance argument, instead focusing on the issue of whether various representations made by Rex Ott and Ray Ott were statements of a factual nature. Doc. 85 at 5-10. By failing to address Centre's reliance argument, Adrian has waived the argument that it relied on any of the statements at issue. *See, e.g., Satcher v. Univ. of Arkansas at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 735 (8th Cir. 2009) ("failure to oppose a basis for summary judgment constitutes waiver of that argument."). This waiver, alone, serves as a basis to grant summary judgment in Centre's favor on Adrian's claim of fraudulent misrepresentation. Nonetheless, I will consider Centre's alternative argument that the statements at issue were either true or were nonactionable opinions or puffery.

Howard Adrian identified the Navistar custom service contracts as the only written documents he reviewed that were important to his decision to buy the trucks. Doc. 85-1 at 13, ¶ 63. Adrian does not allege that any statements set forth in those service contracts form the basis of its fraudulent misrepresentation claim. Howard Adrian also testified to several verbal statements that Rex Ott or Ray Ott made during their sales visit to Adrian. Doc. 69-1 at 9. These statements were:

1.  Rex Ott told Howard Adrian he "[s]hould not have to do nothing to these trucks because of all the of [sic] warranties." Doc. 85-1 at 9, ¶ 41.

23

2.	The trucks were "road ready," which Howard Adrian understood as meaning the trucks were "ready to go on the road. Bring them out, put your license on, and go to work." *Id.* at 4, ¶¶ 17-18; Doc. 69-1 at 10.

3.	The trucks got "outstanding fuel mileage," at "probably [] eight miles a gallon," and Howard Adrian would not "believe how good of mileage you are going to get." Doc. 69-1 at 10; Doc. 85-1 at 9, ¶ 43.

4.	The trucks "were all clean air trucks [that m]et emissions." Doc. 85-1 at 6, ¶ 29.

5.	Navistar has a network of dealerships throughout the country that can take care of the trucks. *Id.* at 11; Doc. 85-1 at 9, ¶ 45.

6.	The trucks were "set up the way you would like them," which Howard Adrian understood to mean they had low mileage and he could run the trucks for three years and then "move them" once the warranty expired. Doc. 85-1 at 5, ¶¶ 23-25.

7.	One of the Otts told Howard Adrian, "I've got some trucks I think would work good for you." Doc. 69-1 at 11; Doc. 85-1 at 10, ¶ 48.

8.	The trucks were "like, new trucks, and they are excellent." Doc. 69-1 at 11; Doc. 85-1 at 10, ¶ 49.

9.	Rex Ott told Howard Adrian that the trucks had "some problems in 2010," but they had been "rectified" and "taken care of." Doc. 69-1 at 11; Doc. 85-1 at 8, ¶ 36. Howard Adrian testified that, regarding the prior statement, "I really don't know that [Rex Ott] was being untruthful the day he told me. I don't think he knew himself." Doc. 85-1 at 8, ¶ 39.

10.	The Otts described the trucks' "motors and transmissions" and "may have" explained or described the EGR technology. Doc. 69-1 at 11. Regarding the technology, Howard Adrian testified that "I don't know that I would have understood even what he was saying." *Id.* He also testified that "I don't know nothing about that motor" and "you would have to be down in

24

that [price range] number [] before I would even consider." Doc. 85-1 at 8, ¶ 37.

Howard Adrian "testified that what was important in making his decision to purchase the [t]rucks was the warranties, the mileage of the [t]rucks, and their price." Doc. 85-1 at 13, ¶ 66. Viewing the evidence in the light most favorable to Adrian, statements 1, 2, 5, 6, 7, 8 and 9 bear some relation to mileage, price, warranties or Navistar's ability to service the trucks nationwide (implicating the value of the warranties). Statements 3, 4 and 10 do not. Thus, even if Adrian had not already waived any argument concerning reliance, statements 3, 4 and 10 could not form that basis of Adrian's fraudulent misrepresentation claim.

With regard to the remaining statements, I will next consider whether Adrian has produced evidence permitting a finding that they were false and that they were made with intent to deceive. *See, e.g., Van Sickle Const.*, 783 N.W.2d at 687. Falsity and the speaker's intent to deceive "may be shown when the speaker has actual knowledge of the falsity of [the speaker's] representations or speaks in reckless disregard of whether those representations are true or false." *Id.* at 688 (cleaned up). To prove a representation was false, the plaintiff has "to establish that the representation was false at the time it was relied upon." *Hagarty v. Dysart-Geneseo Community School Dist.*, 282 N.W.2d 92, 95 (Iowa 1979). "An honest belief in the truth of one's statements . . . does not preclude a finding of fraud. When a defendant makes a misrepresentation recklessly, with careless disregard for whether it is true or false, he may be liable for fraud." *Beeck v. Kapalis*, 302 N.W.2d 90, 95 (Iowa 1981).

The Iowa Supreme Court has explained:

a mere statement of an honest opinion, as distinguished from an assertion of fact, will not amount to fraud, even though such opinion be incorrect. When the statements become representations of fact, or the expression of opinion is insincere and made to deceive or mislead, they may be treated as fraudulent. Whether such is their quality and character is ordinarily a jury question.

25

*Hoefer v. Wisconsin Educ. Ass'n Ins. Trust*, 470 N.W.2d 336, 340 (Iowa 1991) (cleaned up). "If a statement is a specific, measurable claim or can be reasonably interpreted as being a factual claim, i.e., one capable of verification, the statement is one of fact. Conversely, if the statement is not specific and measurable, and cannot be reasonably interpreted as providing a benchmark by which the veracity of the statement can be ascertained, the statement constitutes puffery." *American Italian Pasta Co. v. New World Pasta Co.*, 371 F.3d 387, 391 (8th Cir. 2004).

Here, statement 1 was that the trucks were under warranty such that Adrian "[s]hould not have to do nothing to these trucks." This referred to the warranty coverage for repair and/or replacement of parts and was not false when made. Howard Adrian testified that the trucks had "very good warranties" that "covered anything I'm concerned about" and the custom service contracts "basically covered everything on that truck for me." Doc. 85-1 at 14, ¶¶ 71-72. He further admitted that "he never had to pay out of pocket for parts and repairs that were covered under warranty" and he "could not say that there was ever a time Adrian took a [t]ruck in for a repair and they got it back not being repaired." *Id.* at 16, ¶¶ 82-83. Adrian has failed to produce evidence suggesting that statement 1 was false.

Statement 2 was that the trucks were "road ready," which Howard Adrian understood as meaning they were "ready to go on the road. Bring them out, put your license on, and go to work." He admitted that Adrian operated the trucks as soon as they were delivered and that he had no knowledge of any of the trucks needing repairs when they were delivered. Doc. 85-1 at 4, ¶¶ 19-20. It is undisputed that each truck operated an average of 40.7 days and 10,686 miles before needing any repair, and Adrian operated them even longer before the engines or EGR systems needed repair. *Id.* at 4, ¶ 21. Adrian has failed to produce evidence suggesting that statement 2 was false when made.

Statement 5 was that Navistar had a network of dealerships throughout the country that could care for the trucks. Again, Howard Adrian's testimony precludes any argument that this statement was false when made. He testified "that Navistar does have

26

a network of dealers around the country and that those dealers do have certified technicians on site." Doc. 85-1 at 10, ¶ 47. Further, Adrian's complaint notes that "Navistar sold its trucks through a nationwide network of authorized dealers" and used "the Navistar Network to have trucks repaired when mechanical issues arise." Doc. 48 at 4, ¶¶ 8-9. Adrian has failed to produce evidence suggesting that statement 5 was false when made.

Statement 6 was that the trucks were "set up the way you would like them," which Howard Adrian understood to mean they had low mileage and he could run the trucks for three years and then "move them" once the warranty expired. Statement 7 was that "I've got some trucks I think would work good for you." Howard Adrian testified that Rex Ott "knew I liked to every so often upgrade, and he knew I liked lower mileage." Doc. 85-1 at 5, ¶ 25. He also testified that the trucks "fit the typical specifications" he looked for when deciding to buy a truck and that they "were equipped right for what we would look at for trucks." *Id.* at 6, ¶ 28. Adrian has failed to produce evidence suggesting that either statement 6 or statement 7 was false when made.

Statement 8 was that the trucks were "like, new trucks, and they are excellent." When Howard Adrian purchased the trucks, he knew they were used, having been initially purchased between 13 and 15 months earlier, and that they had been operated between 185,902 to 232,797 miles. *Id.* at 6, ¶¶ 26-27. Statements to the effect that a used vehicle is "like new" or "excellent" are subjective descriptions that are not specific and measurable but, instead, are classic statements of puffery. *See, e.g., American Italian Pasta Co.*, 371 F.3d 3 at 391. Adrian cannot, as a matter of law, show that these subjective statements were false when made, or that they were made with an intent to deceive. Statement 8 cannot form the basis of a claim for fraudulent misrepresentation.

Finally, statement 9 was Rex Ott's statement to Howard Adrian that the trucks had "some problems in 2010," but they had been "rectified" and "taken care of." Every aspect of this statement is vague. What was the nature of the "problems?" How were they "rectified" and "taken care of," and what do those concepts mean with regard to the

27

unspecified "problems?"  Such general and immeasurable statements cannot form the basis of a fraudulent misrepresentation claim under Iowa law.  Moreover, even assuming the statement was a reference to Navistar's past efforts to improve the reliability of the trucks' EGR systems (*see* Doc. 85-2 at 11, ¶ 55), Adrian has not produced evidence suggesting that the statement was false when Rex Ott made it.  As noted above, Howard Adrian admitted that Adrian was able to operate the trucks when they were delivered and testified that he had no knowledge of any of the trucks needing repairs when they were delivered.  Doc. 85-1 at 4, ¶¶ 19-20.  Adrian then drove the trucks for an average of over 10,000 miles each before any repairs were needed.  *Id*. at 4, ¶ 21.  As a matter of law, Adrian has failed to establish that statement 9 supports a claim for fraudulent misrepresentation.

Due to the lack of any argument from Adrian concerning reliance, and in light of Adrian's failure to generate any genuine issues of material fact as to whether Centre made false material statements of fact, Centre is entitled to summary judgment on Adrian's fraudulent misrepresentation claim.

### b. *Fraudulent Nondisclosure*

Adrian's remaining fraud-based claim is that Centre fraudulently failed to disclose material facts when it was under a duty to do so.  *In re Marriage of Cutler*, 588 N.W.2d 425, 430 (Iowa 1999) (listing the seven fraud elements and defining the first as "misrepresentation or failure to disclose when under a legal duty to do so").  In seeking summary judgment on this claim, Centre argues: (1) it did not have a duty to disclose information to Adrian and (2) Adrian has not provided evidence that Centre was aware of any allegedly-concealed material fact.  *Id*. at 12.  By way of resistance, Adrian argues that "Centre State had knowledge about the products it was selling that was not available to Adrian, and there is ample evidence that the statements Centre State made were untrue statements intended to influence buyers like Adrian."  Doc. 85 at 6.  The majority of Adrian's argument is devoted to documenting Navistar's internal discussion of the EGR

28

technology problems, which it claims Centre must have been aware of due to Rex Ott's general statement that the engines had previous problems. *Id.* at 6-10.

The Iowa Supreme Court has held that an actionable failure to disclose "must relate to a material matter known to the party . . . which it is [the party's] legal duty to communicate to the other contracting party[,] whether the duty arises from a relation of trust, from confidence, from inequality of condition and knowledge, or other attendant circumstances." *Sinnard v. Roach*, 414 N.W.2d 100, 105 (Iowa 1987). When parties are involved in a business transaction, such as a buyer/seller relationship, "an actionable misrepresentation may occur 'when one with superior knowledge, dealing with inexperienced persons who rely on [that party], purposely suppresses the truth respecting a material fact involved in the transaction.'" *Wright v. Brooke Group Ltd.*, 652 N.W.2d 159, 174 (Iowa 2002) (quoting *Kunkle Water & Elec., Inc. v. City of Prescott*, 347 N.W.2d 648, 653 (Iowa 1984)).

A disclosure obligation "can be triggered when a party to a business transaction makes a partial or ambiguous statement of the facts. In that circumstance, other matters may need to be said to prevent the statement from being misleading." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Olson*, 807 N.W.2d 268, 281 (Iowa 2011). However, "there must be a concealment—that is, the party sought to be charged must have had knowledge of the facts which [that party has] allowed to remain undisclosed." *Reynolds v. Solon State Bank*, No. 07-0085, 2007 WL 4553648, at *5 (Iowa Ct. App. Dec. 28, 2007) (quoting *Wilden Clinic, Inc. v. City of Des Moines*, 229 N.W.2d 286, 293 (Iowa 1975).

In this case, the only evidence Adrian has presented as to Centre's knowledge is (1) Rex Ott's statement that the trucks had "some problems in 2010," but they had been "rectified" and "taken care of" (Doc. 69-1 at 11; Doc. 85-1 at 8, ¶ 36), and (2) Howard Adrian's testimony that "I really don't know that [Rex Ott] was being untruthful the day he told me [the previous statement]. I don't think he knew himself" (Doc. 85-1 at 8, ¶ 39). Adrian's remaining evidence relates to Navistar's knowledge of issues with the engines, not Centre's knowledge. Doc. 85 at 6-10.

Even assuming Rex Ott's statement shows he had some general knowledge of past issues with the engine technology, Adrian has failed to show that he had specific knowledge of the information Adrian claims he should have disclosed. Despite a full opportunity to engage in discovery, Adrian has not produced evidence demonstrating that Centre (or Rex Ott, in particular) was aware of Navistar's internal discussions of the EGR technology at the time Rex Ott and Ray Ott spoke with Howard Adrian. This lack of evidence prevents Adrian from establishing that a concealment occurred. Centre is entitled to summary judgment on Adrian's claim for fraudulent nondisclosure.

## VI. CONCLUSION

For the reasons set forth herein, both motions (Docs. 69, 70) for summary judgment are **granted in their entirety**. All claims asserted in this case by plaintiff Adrian Trucking, Inc., against defendants Navistar, Inc., and Centre State International Trucks, Inc., are hereby **dismissed with prejudice**. Judgment **shall enter** against the plaintiff and in favor of the defendants. The Clerk of Court shall **close this case**.

**IT IS SO ORDERED.**

**DATED** this 1st day of July, 2022.

_____
Leonard T. Strand, Chief Judge

30